23-129, 23-6148, 23-6149, United States of America v. Ayatollah and Almaleh. I understand that Defendant Almaleh's case is on submission, so we will be hearing from counsel for Ms. Ayatollah and then counsel for the government. Good morning and may it please the court. My name is Elizabeth Johnson and I'm representing the Defendant Antionetta Ayatollah. Ms. Ayatollah was convicted after jury trial of four counts. Every single crime of which she was convicted had as an essential element her intent to defraud. Either her intent to fraudulently influence the FDIC or her intent to fraudulently obtain property from tenants to whom she rented apartments. And the only element that was contested at trial was her fraudulent intent. Her defense, both through argument and her own testimony, was that she genuinely believed everything that she was saying in good faith, whether it actually turned out to be true or not. At trial, the district court repeatedly and erroneously admitted highly prejudicial evidence that went directly to Ms. Ayatollah's defense, including judicial findings that she had committed fraud, hearsay that she had committed fraud, hearsay that her co-defendant and husband was aggressive to people, hearsay that she had stolen the keys to these apartments that were at issue. Did it say that she had stolen the keys or that the key had been stolen? The key had been stolen, but I believe that the obvious inference that a lot of jurors would take is that they, let me step back. Or that she had come into, I don't know that that's an obvious inference or that she had somehow, I mean, come into possession of the key that somebody else stole. I don't know. Well, I will tell you, Your Honor, when I was reading the transcript in this case, one of the things that did stick out to me was that the defendants were able to give all of their tenants keys that were worked, that they could get into the apartments with the keys that were provided to them. And I was waiting for the testimony from a locksmith or somebody knowledgeable to say that they had the apartments re-keyed. And then we get this hearsay elicited for no legitimate purpose that, oh, the keys were stolen up in New York. And I see no probative value for that statement, and it's clearly potentially extremely prejudicial, and the trial court never makes that finding. I understand your argument about it. I guess the question in my mind is, given the extraordinary amount of evidence against your client, I don't really, you know, it has to be a lot more prejudicial than all the other evidence that legitimately came in, such as that every single one of these tenants who came in to rent these apartments was immediately kicked out, immediately, and some of them by the police, which seems quite appropriate for them to tell their story of how they learned they were not allowed to be in there and that they were put on the street and they asked for their money back, and Ms. Ayatollah wouldn't ever give it back. I mean, including some clients who said, this is all the money I had. I scraped together every penny, and I told her that. So I get your argument that maybe some of these things should not have come in, like the stolen key, but then I wonder, how does that tilt the scales here? I would point, I would talk, I would go talk about the Third Circuit's decision in Koppel, which is where you have a fraud case, and the defendant is charged essentially with taking money from a whole bunch of people, telling them he's going to invest it, and then he steals it and he spends it. And the Third Circuit talked very clearly about what kind of evidence we allow for fraudulent intent, because obviously it's hard to prove, right? And absolutely, while it is not a required element that someone's actually defrauded, the fact that they were is relevant, and it is also relevant that when they ask for their money to be returned, they don't get it. And the defense here never said that there was no, those tenants could absolutely say, I rented the apartment, I was removed from the apartment, I asked for my money back, I didn't get it. But what we get is a lot of extremely inflammatory evidence that goes way beyond that, and it's the same thing that happens in Koppel, is that the victims testify not only, I gave them my money and I didn't get it back, but as a result, I had to give up my medical insurance, and my kid couldn't go to college, and I'm depressed, and I can't sleep. And the Third Circuit says quite clearly that's not a harm resulting from the crime. That is purely inflammatory. You've already established that these people didn't get their property back. And anything else that you're doing has no purpose and no effect. But some of those things become relevant when the victim tells the defendant this, and now this puts the defendant on notice of what's going on, right? And if the only question in disputed trial is the defendant's mental state, so now there's evidence about the defendant being on notice of what's going on and how extreme this situation is, and you would think that a non-fraudulent landlord would then make a point of giving the money back when they hear, oh my gosh, not only did I not have the right to rent that apartment to you, but it's also the last penny you have on earth. Well, that most landlord is going to give it back and to then say, no, no. But how is that different from if you don't give me my money back, I'm going to die of cancer, right? This is pretty much exactly what we're talking about. I would absolutely agree with Your Honor if what we are talking about is whether this is relevant at sentencing, but that's not what we're talking about. We're trying to make sure. But you disputed her intent, which you have the right to do. But once you dispute intent, the government's got to prove it. So how do you not prove it if you don't tell the jury what was told to the defendant? I get things like the stolen key because it doesn't, I don't recall any testimony. There's zero testimony that it is ever told to anybody. Right. So I get that and issues like that. But some of the relatively inflammatory things that were then recounted to the defendant seem sort of, in a way, the more inflammatory, the more probative they are to the extent that she was told these things, which are quite extraordinary, and she still didn't give the money back. A lot of them were not told to her. The key was not told to her. The aggressiveness was not told to her. And to the extent that some of them were, I mean, the 403 balance isn't just how probative it is. It's how prejudicial it is. And courts do routinely exclude evidence, even though they say we understand it's pretty probative, because of how much the jury cannot be expected to disregard the inflammatoryness of it. And so I do think that that's what we're talking about when we're talking about things like, not only did the police remove me, but they told me I had no right to be here. How do the police know, right, that that's pure hearsay, does nothing but try to create an impression that, in fact, the police are investing them. There are a huge amount of scams going on everywhere for which there is no evidence. And the police pulled guns on me. Well, why? We don't know. And there are a whole lot of reasons that it could be that don't have anything to do with Ms. Ayatova, and it is extremely inflammatory. Well, the guns thing is maybe not the most helpful thing to you, because, again, they told Ms. Ayatova they pulled me out, and they handcuffed me, and they put guns on me, right? So, again, that's putting her on notice to the extent she's saying, well, I have no idea. I thought I owned these places. But when you hear, oh, my gosh, my putative tenants were removed by the police at gunpoint and handcuffs, maybe I ought to rethink whether I own this apartment. It's usually a clue that you should think more. I think that it is extremely equivocal evidence. I think that a lot of people would not assume that police are pulling guns on someone because they weren't supposed to be in an apartment. That sounds like an extreme overreaction to someone allegedly squatting, and I would assume there could be all kinds of other reasons for it. Does my tenant have a warrant? Is this an apartment in a building or a neighborhood where there have been substantial crime problems? Are these police officers trigger-happy? I think it is so prejudicial, and it has minimal probative effect beyond the police were the ones who removed me, which there was no objection to that coming in. This combined with all of the other hearsay that you get, these witnesses are permitted to testify to every bad thing they ever heard from anybody about these defendants. None of these declarants are identified. None of them show up. We have no idea what the basis of their knowledge is, and it just creates a general picture that these defendants are bad people. They are bad people, and they do bad things, and they don't care about the bad things that they do, and that is the absolute most clear kind of prejudicial evidence under 403 or 404B that we exclude. Okay. I think we have your argument. Unless there are any other questions right now, why don't we have you back in a few minutes. Let's hear from the government. Thank you, Your Honor. A.J. King. Good morning. May it please the Court. My name is Matthew King. I'm an assistant United States attorney here in the Southern District of New York. I represent the government on appeal, and I also represented the government at trial. I'd like to just start on a point that Your Honor Judge Nardini kind of made at the outset of my opponent's argument, which was that even if this panel was to find error in Judge Ramos's decisions on these specific evidentiary points, which, of course, the government does not agree that it was error there, how does the defendant get over the harmlessness error or even the abuse of discretion standard of review? The problem is if you have a whole series of cumulative errors, then it can sometimes add up. Can I ask you about some of the particular things? Of course, Your Honor. Why did the stolen key come in? How is that admissible? Was it told to Ms. Zaitova that the key was stolen? The specific statement that the key itself was stolen didn't come in per se, but what came in – I ask, was it told to Ms. Zaitova? It was not. The key was given on the key. Okay. So it doesn't go to proof of her state of mind. So what does it go to? So it was admissible to explain why Ms. Patterson, who was the victim who testified about that, then went – part of the story of why she confronted the defendant about what was taking place at the apartment they thought they were legitimately renting from her. If you took that piece out, if that bit about the stolen key had not come in, wouldn't you have still been able to tell the story, the same story? Or would it have been baffling to the jury, you think, that she would have gone to Ms. Zaitova and said, why can't I rent this apartment? I'm not sure how that moves the needle. Your Honor, the government's view is that it is relevant for the jury to consider and that the standard isn't what – I fully respect what Your Honor is saying – the standard isn't that is this necessary to convict the defendant. Yeah, but is it – I mean, for one thing, it's hearsay, so there's a worry that it's going to be taken for the truth of the matter asserted. Was there a limiting instruction given for that particular statement? There was not, Your Honor, and the defendant did not request – You have to agree, right? There's no way that could be considered properly by the jury for the truth of the matter asserted, right? I mean, who was this declaring? Certainly not, Your Honor, and the government wasn't arguing at the time that it should be admitted for the truth of the matter. So I guess I'm wondering, why did the government not affirmatively seek a limiting instruction? I mean, you've got to protect the record here, right? Your Honor, the government felt that the evidence was properly admitted because it helped to explain why Ms. Patterson and her son – But it's hearsay. It's blatant hearsay. It is hearsay, absolutely, Your Honor. So why would you not seek a limiting instruction? See, that's what I don't get for some of these things. Why would you not seek a limiting instruction and protect yourself? Because now you've got some of these things scattered on the record that are just – as far as I can tell, just blatantly inadmissible hearsay with no limiting instruction. Again, Your Honor, the government's view here on this particular issue of the key was that it was non-hearsay because it was being admitted to explain why the victim – But the jury wasn't told that. If the jury's not told that it's admitted for a limited purpose, they can consider it for every purpose, right? Presumably that's – I mean, the jury is not expected to know the rules of evidence, right? And say, oh, wait a minute, you know, judge didn't tell us, but I know that it's hearsay and therefore it's not admissible to prove the truth of the statement asserted, right? We don't assume juries know that. I hope they don't know that. That's true, Your Honor. Again, the defense did not ask for a limiting instruction on that note. That's not always what the government should be doing. It's just waiting for the defense, right, and trying to get it in without thinking. Certainly not, Your Honor. I just wonder whether the government went a little far in this case and should have been more careful. On the key point in particular, one point I just would like to emphasize is that while the key – the specific point about the key itself was not conveyed to the defendant, the overall effect of what was happening, which included the key, which included statements made to the victim about that they weren't – that there was another owner of this, was conveyed in substance and in part to the defendant by Ms. Patterson and her son explaining to the defendant that this was all a scam and that we want our money back and all the points that Your Honor mentioned before. To separate out the individual pieces of evidence that led to the victim drawing the conclusion that they were being defrauded, which then led to them making the decision to confront the defendant, I think is cutting it very finely. Right, but it just seems like for a lot of these, the basic idea is if you've given someone a bunch of money for an apartment, you move in, and you get thrown out, told you have no right to be there, people – the idea that someone is then going to confront the person who they gave the money to, that's not some exotic thing that the jury would be like, oh, I wonder why they wouldn't have confronted her. Oh, it's because they heard the key was stolen. That's not the reason they confronted her because they lost all this money. And so all of these particulars about things that these individuals heard along the way that, oh, yeah, she's done this before. That doesn't – I don't see how that is necessary to the narrative because the narrative itself just of I gave her all this money, and then I got kicked out, that's why they approached her. That's why they went to her and said, give me my money back. So I want to make a couple of points. One is that I think that is one of the inferences that can be drawn, the inference that Your Honor was suggesting. But there are, of course, other inferences that the jury may draw that the government isn't aware of what the jury is thinking at the particular time it's making its conclusion about the evidence. What's another inference someone would make, though, when they hear that these individuals give this money and they're kicked out and they go to confront her? I mean, what's the other inference, I guess, a possible inference? If the jury is not aware of what the victims were thinking at the time they made a decision to confront the victim. So you think that if a jury just heard, they didn't hear anything, if they just had it described to them where the witness testifies, I gave her this money, I went there, I got kicked out, and then I went to speak to her and try to get my money back, someone's going to be wondering, well, why did you go to try to get your money back? So I think a thing to consider on this point is that the credibility of these victims was hotly contested at trial. So it wasn't as though the defense accepted these victims as innocent victims. They cross-examined these victims in a way that other defense counsel might not, a sympathetic victim such as this. So their credibility was being challenged by the defense. So the information that they obtained that led them to make the decision to then go confront the defendants, in the government's view, was relevant, and it was non-hearsay and admissible because it helped explain why they took those actions. Except the jury wasn't told that it was admitted only as non-hearsay. See, that's the thing. If you give limiting instructions, we do presume that juries follow them. But the worry is then if you don't give the limiting instructions, the jury starts making extra speculations, that, well, maybe the key was stolen, and then who maybe stole the key and all that. If you had a limiting instruction on, I'm just using the key because that's the most convenient example and perhaps the most stark example in my mind, of something that you could have easily sought a limiting instruction, it would have served the purpose that you were asking to explain why did the tenant do this. And I get that. You've got to tell the story of what actually happened in the real world. But you also have to be careful not to admit evidence that's improper. And, again, it's incumbent on the government to do that. And now you've got this tricky situation where you're arguing that there was overwhelming evidence, that even if we do have accumulation of some small errors, that the evidence of the defendant's intent to fraud is so overwhelming that the admission is harmless. But that in some ways is also an admission that you didn't really need this to tell the story, right? That if these things are harmless, that means that even without them, the evidence would have been overwhelming. So at a certain point, the government has to be really careful not to push the envelope and to really cross its T's and dot its I's and think very carefully about how individual pieces of evidence come in. And it seemed here that there was a little bit of, I don't know, pushing the envelope here. Your Honor's point is taken. I think – and what I would like to do is just clarify because I think there's some confusion about what is in fact being challenged. May I ask a very simple question? Were you trial counsel with respect to these matters? I was, Your Honor. Okay. Good. I always appreciated the fact that the Southern District seems to make it a practice to have the trial lawyer appear before us on appeal so that the person can say, well, I might have done it differently, but – so thank you. Certainly, Your Honor. And I'm trying to balance the line appropriately here. Maybe again, just to not put too fine a line on it, perhaps because you are here, the message you will take away is perhaps next time you won't do it the same way. We certainly consider all the things that Your Honor is stating today. Again, if I may, I just want to make quite clear what the defendant is challenging because I think only a small sliver of things falls in this bucket, the bucket of the key, for example, and I think that's relevant to this panel's decision about whether there was an abuse of discretion here. What about that Amelie was aggressive? Yes, Your Honor. That specific statement was not – Maybe that doesn't hurt this particular defendant. Maybe it hurts more Mr. Amelie, but I don't know. It is charged – they're co-defendants. Again, similar to the key, that is one of those things that fall in this bucket. There's the aggressive statement and the key statement fall in this same bucket. From the government's view, those are really the two things that fall in that particular bucket where that specific fact, as it was, was not directly conveyed, although the government's view is the kind of whole sum and substance of why that was relevant was conveyed. But those are the two things, and so when you're considering whether the introduction of those two pieces of evidence at a trial of this length with this amount of other evidence that was devastating to the defendants, whether that constitutes error that was harmful, the government's view is that that does not and that it wasn't more prejudicial, as Your Honor put it, than all of the other evidence of their guilt that was presented. So that's the point I would like to make on the key and the aggressive. As part of that, I just want to be quite clear that the other evidence that the defendant is challenging was conveyed to the defendant. The notion of them being scammed, the victims being scammed, was conveyed to the defendants. The idea that Ms. Torres was held up at gunpoint or removed at gunpoint by the police was conveyed to the defendants. So with respect to Ms. Torres, that's at the IATOVA Appendix 438. She explained that she told the defendants that she was held up by gunpoint by the police, and, of course, what makes that relevant is then Ms. Torres was asked, how did the defendant respond to that? And Ms. Torres says she didn't really have much to say. And that's why that's important evidence for the jury to consider. What about the FDIC examiner's testimony that the application was most likely fraudulent? Tell me about the charge relating to the FDIC. Describe that charge to me. Yes, Your Honor. It's essentially lying to the FDIC. Was it lying? It was a lying false statement charge? What was the statute? 1340 or 1007? Yes, Your Honor. Making false statements. I believe it's got other elements than just your classic false statement charge. So how does that not go to the ultimate issue here about most likely fraudulent? Because it's not just going to the objective falsity of the statements, right? If the bank examiner had said, well, the form was filled out and it said the sky is blue, but in fact we know it was raining that day or something because I saw it, that's one thing. But to say most likely fraudulent, isn't that a statement not just about the objective falsity but peering into, purportedly peering into the mind and the intent of the subscriber? And how is that not going pretty deep into areas that usually fact witnesses can't go? I don't think so, Your Honor, and I think the way that that statement came in at trials is very relevant to this particular consideration. So Mr. Garibaldi was at, and this is at Appendix 829, Mr. Garibaldi was asked, did the FDIC grant the application? He responded, no, we did not. Then he was asked, why not? And then he stated, the application, after I reviewed it and gave it to my supervisor, I think both our assessments were the application was most likely fraudulent. That statement was elicited as to a question about why you did not grant the application. You prepped the witnesses in advance, hopefully. Well, it's an explanation for why the agency took the step. Sometimes your witnesses tell you something and you say, look, that's not going to be admissible, so I'm going to ask you a different question. I'm going to ask you more pointed questions. You said to the district judge, well, I'm going to ask more specific questions here. I'm going to say, well, when you looked at question number eight, what was the answer given? Was that, in your view, accurate? Now, you can ask leading questions to get around this thing. Yes, Your Honor, I think in the context. So it's not like you just had to ask that question, and I hope it's not that you didn't know what the answer was going to be. No, and I think here the question of why the FDIC did not accept the application is important to the jury to understand what the facts were. What if the examiner had wanted to say, well, because I thought that Ms. Ayatova was a fraudster? Would that have come in, in your view? Because, hey, that's what he thought. He gets to testify to it. Really? Your Honor, I think that's probably further along the line than this statement here. That's why I'm asking. I don't think that statement is this statement. Why? Why would that not come in and this one doesn't? Because here the reason that the agency did not send the application back to the defense and therefore put them on notice of their conduct, which is, again, the entire defense here is what did they think and what did they intend to do? Did he write back on this, most likely fraudulent, and then send it back with that big stamp, said most likely fraudulent? No, I don't think he said. So then why is the statement of why he sent it back? I get that it was sent back certainly puts him on notice. What he said to them when he sent it back puts him on notice. But what was in his brain when he sent it back doesn't put him on notice of what's in his brain, does it? Not in so many words, Your Honor. So that's why I'm asking why there's a distinction between my hypothetical that you seem to agree he would not have been permitted to say because I thought Ms. Zaitova was a fraudster, and what he did testify, which is I didn't approve the application because I thought it was most likely fraudulent. Is it just the level of certainty? I think it's what he has described, and this, I think, goes into why it's not a lay opinion. It's what he's describing. In Your Honor's hypothetical, he's describing what he thinks about the individual who submitted the application, of which he has very limited information. It's not his role. That wasn't his role at all. His role was to evaluate the application. That was part of what he did, and his evaluation of that application was relevant to what he would then do with it. What I didn't hear was that it was fraudulent, and the word fraudulent implies an intent to deceive. Your Honor, I think— I mean, I don't know what else fraudulent is taken to mean. I think it was meant in the context here with this particular witness, who was identifying the red flags, is that fraudulent wasn't necessarily I believe they were attempting to deceive me. What else does it mean? Because it was— What else does it mean? So the other facts about what was wrong with the FDIC application was that there was individuals listed who were not on the board of directors. No, I get it. What is the word fraudulent expected to mean? I get that there may be all sorts of problems. That it was false, that the information contained in it was false, and that it can be used as a synonym. Again, I just—you've got to be careful when you question witnesses like this. You've got to be careful, and sometimes when you know that there's something that's a landmine, you have to dance around it, and that's when you ask the district judge for permission to end leading questions so that you don't leave these things lying in the middle of your case, where you're basically asking a witness to opine potentially on the mental state of the applicant, and the mental state is exactly what's at stake at trial. Again, Your Honor's point is well taken. I think in this context, given the standard of review, given the harmlessness, given the other evidence that was admitted that shows the defendant's knowledge and intent to deceive, that even if Your Honor were to conclude that Judge Ramos abused his discretion, that he erroneously permitted this to come in, that the error wasn't harmless. And again, we're talking about very discreet statements. This is several words out of a very long testimony from a witness about the nature of this application and what he reviewed and what he flagged. How long was the trial, remind me? I think it went—it was about a week long. It went over into a second week. I don't quite remember, Judge Sack, exactly. There were some delays, so in terms of trial days. Okay, but about a week. Yes, Your Honor, I believe that's correct. All right, Judge Sack, do you have any further questions? No, sir. Okay, thank you. We have the government's argument. Thank you, Your Honor. I appreciate it. Why don't we hear from counsel for Ms. Ayatova? Thank you. And why don't we just try to keep it to two minutes. I'll do my best. Highlights. Thank you. I did want to just respond to a couple of things that came up in my adversary's argument. And the first one is that the government does habitually talk about this hearsay coming in because it is relevant to showing these tenant victims' state of mind, which isn't an issue at all. And I believe that Judge Lee very accurately described what's going on here. They give money for apartments. They go to the apartments. They get kicked out. They go ask for their money back. Pretty straightforward. The defendants never argued, and it would have been legally irrelevant if they did, that these people were asking for their money back for some bad reason. It wouldn't matter. They went. They asked for the money. The defendants didn't give it back to them. What matters is what the defendants did. And maybe what the tenants did, but for sure not what the tenants thought. And they had ample motivation for what they did outside of all this extremely prejudicial hearsay. And I would point out that the key testimony we've been talking about was elicited directly by the government. They said, what did you hear about the keys? And the witness says, I heard they were stolen. No limiting instruction, and the judge overrules the hearsay objection with no explanation, and there's no instruction whatsoever. And he had been consistently letting in this kind of hearsay without making any 403 considerations or rulings whatsoever. Similarly, Mr. Garibaldi's statement that this was a fraudulent application, second page of his testimony. He has not given any basis of his opinion. He has not described the application. He has not done anything that would actually be helpful to the jury except tell them the defendants are guilty. He subsequently testifies at great length about this application, about what was strange about it, about what wasn't consistent with his experience, which is very helpful to the jury, an absolutely reasonable fact testimony. But for him to then draw the conclusion that the defendants intentionally lied, and even better, that his supervisor, who's not testifying, agreed with him, is entirely prejudicial and not helpful lay opinion and should not have come in at all. We didn't even talk about the judicial rulings, which I would love to, but my time is up. We have your briefs, and we very much appreciate them. May I have one question, if I may? Yes, Judge Sack, thank you. Can you, in the most general terms, it's a little difficult because Mr. Amar is not here and has not listened, his counsel has not listened to the argument. Can you give us some sense as to whether at trial his position was substantially different from the position of yours?  I mean, the defendants are married. Pretty much the evidence that came in was about both of them. There was never really a contention by the government that there was any difference between them, and their defenses were in no way antagonistic whatsoever. That's very helpful. Thank you, Judge Sack. Thank you both. We will take the case under advisement.